[No. C000426. Third Dist. Apr. 29, 1988.]

DONNA GAFFNEY et al., Plaintiffs and Respondents, v.
DOWNEY SAVINGS AND LOAN ASSOCIATION, Defendant and
Appellant.

1158

COUNSEL

Ball, Hunt, Hart, Brown & Baerwitz, Anthony Murray, Joseph D. Mullender, Jr., and Agnes H. Mulhearn for Defendant and Appellant.

Colley, Lindsey & Colley, Nathaniel S. Colley and Jerry D. Sandefur for Plaintiffs and Respondents.

OPINION

**SPARKS, J.**—Defendant Downey Savings and Loan Association appeals from a judgment awarding plaintiffs Donna and Michael Gaffney $77,250 for emotional distress and $250,000 in punitive damages. Defendant is the owner of a promissory note secured by a first deed of trust on property owned by plaintiffs. In November 1983, defendant commenced a private foreclosure against the property by filing a notice of default and plaintiffs filed a complaint for "extinguishment of lien and money debt." Under circumstances to be recounted, plaintiffs later filed a supplemental complaint seeking damages for emotional distress. Following a bench trial, the trial court found that the filing of the notice of default breached a duty of care to plaintiffs, was in bad faith, and was malicious and oppressive and undertaken with a total disregard of the rights of the plaintiffs. Plaintiffs were awarded damages for emotional distress and pain and suffering and punitive damages. Defendant appeals challenging the judgment in a number of respects. We shall reverse.

## Factual and Procedural Background

In 1981 plaintiffs purchased a home in Galt. The property was subject to a deed of trust securing an obligation of approximately $65,000 owed to defendant. Although there was no formal assumption agreement, plaintiffs purchased the property subject to the loan and defendant accepted them as "borrowers." Defendant's loan called for monthly payments of $760. In the summer of 1983 plaintiffs were seeking to borrow money from Western Community Mortgage Company, to be secured by a second deed of trust on the property. While that loan was pending plaintiffs failed to make the payments to defendant which became due on July 1, and August 1, 1983.

On August 8, 1983, defendant notified plaintiffs that they were behind in their loan payments. Plaintiffs were advised that the failure to bring their loan current by September 8, 1983, would result in the acceleration of the sums secured by the deed of trust and the commencement of foreclosure proceedings. Plaintiffs did not reply to this letter.

In mid-September 1983, the escrow for the second secured loan closed. At the close of escrow the title company handling the escrow mailed a check on behalf of plaintiffs to defendant. The check was in an amount sufficient to pay the July and August payments and late charges, but did not include the September 1, 1983, payment which was then due. Plaintiffs mailed their September payment to defendant in a separate envelope but without any notification that the two missed payments were to be sent under separate cover. The checks arrived at defendant's offices on September 16, 1983.

When mail deliveries arrive at defendant's office the payment checks are sent to a payment processing unit. A payment processor will compare the check to the amount due as shown on the computer. If the check is in the correct amount, it will be endorsed and processed. If the check is in an incorrect amount to cover the sum then due, it will be sent to a separate unit for return to the debtor with a notice of payment error. Defendant has no procedure to compare separate remittances to determine whether the combined payments are sufficient. If defendant is not notified that payment is to be made in separate remittances, the separate remittances will be processed independently unless a particular processor happens to realize that multiple payments have been submitted on the account. Such a happenstance did not occur here. The two separate remittances were processed separately, each was determined to be insufficient, and each was sent to another unit for return to plaintiffs.

On September 21, 1983, defendant sent notices of payment error to plaintiffs rejecting each of the attempted payments. The checks were mailed back

to plaintiffs in separate envelopes with separate notices of payment error. Each of the notices stated that foreclosure was imminent, and each advised plaintiffs to contact Marcie Figueroa for the amount due. Plaintiffs did not attempt to contact defendant. Instead, they visited attorney Jerry Sandefur.

On September 27, 1983, Sandefur placed a telephone call to defendant and asked for Ms. Figueroa. Sandefur testified that she seemed confused and said she did not have all of the records on the account because it had been sent to the collection department. Ms. Figueroa could not or would not tell Sandefur what was owed on the account. At trial defendant's representative testified that due to privacy laws it is against company policy to divulge account information to third parties without the written consent of the debtors. Sandefur testified that he attempted to have plaintiffs call defendant but they refused. In any event, the September 27th conversation ended without Sandefur obtaining information about what was owed on the account, and with Figueroa saying she would have someone from the legal department call Sandefur. Sandefur was not contacted by anyone representing defendant until November 1983, after further events had transpired.[1]

Following the conversation with Figueroa, Sandefur formed the opinion that since defendant had rejected plaintiffs' effort at payment for the July, August and September payments, the entire loan balance was extinguished and the lien of the deed of trust exonerated. He nevertheless determined to attempt to comply with Civil Code section 1500. That section provides: "An obligation for the payment of money is extinguished by a due offer of payment, if the amount is immediately deposited in the name of the creditor, with some bank or savings and loan association within this state, of good repute, and notice thereof is given to the creditor." To this end Sandefur opened an account at the Bank of America. He placed the funds from the rejected payments, and the October 1, 1983, payment in that account. The front of the bankbook bears the handwritten notation: "Client trust account solely for the use of Downey Savings and Loan." The account, however, was not set up so that defendant could have access to it. Mrs. Gaffney testified they gave the funds to Sandefur to hold and not for payment to defendant. Sandefur testified that withdrawals from the account would require the signatures of the plaintiffs. He had no intention of releasing the funds to defendant. In the event defendant would have asked for

---

[1] A notation in defendant's internal memoranda indicated that attempts to contact Sandefur were unsuccessful because he had given them an incorrect telephone number. No other evidence was introduced to show that defendant had attempted to contact Sandefur, and at trial defendant's representative had no knowledge of any attempts which failed due to an erroneous telephone number. Sandefur testified that he believed he had one further conversation with "some lady" from defendant's office but that his telephone records did not show it and he could not remember the substance of any such call.

release of the funds, Sandefur intended to file a judicial action asserting his position that defendant was owed nothing due to its refusal to accept the original payments. Sandefur then sent this letter to defendant: "This is to advise you that Donna Gaffney has had the payments for July through Oct. 1983 deposited in a trust account wherein Downey Savings and Loan is listed as beneficiary. Attached is a copy of the bank book showing the account number and the Bank of America branch. Please be advised that due to your failure to accept the full payments timely tendered for the July through September payments it seemed fruitless to mail the October payment to you. We will be filing an action forthwith to have the Court determine whether the lien on the subject property referenced above has been redeemed or extinguished as result of your refusal to accept payments. [¶] Please be advised that I never received a call from anyone even though as you know I attempted to resolve this matter without this action."

Although Sandefur's letter neither requested information from defendant nor explicitly invited further contact, he testified he had the "hidden intent" of provoking a response. He also testified that he advised plaintiffs to continue making their payments but to note on the checks the payment was under protest. Plaintiffs did not continue to make their payments, nor did they place the amount of the payments in the trust account set up for that purpose. In fact, there was no further communication between the parties until after November 21, 1983.

On November 21 plaintiffs filed their complaint for the extinguishment of lien and money debt. The complaint set forth Sandefur's view that the refusal to accept the July through September payments gave plaintiffs the right to the extinguishment of the entire secured debt and lien of the deed of trust. At that same time defendant was in the process of commencing foreclosure proceedings on the property by submitting it to the trustee under the deed of trust. A notice of default was ultimately filed and recorded by the trustee and sent to plaintiffs. As part of the procedure an appraisal was ordered and appraisers took photographs of the house from the street in front of the house. Plaintiffs observed the photographs being taken and testified that this observation added to their emotional distress.

At some time between the filing of the complaint and the recording of the notice of default Sandefur mailed a copy of the complaint to defendant. The matter was brought to the attention of Gary Steinberg, defendant's general counsel and senior vice president. Steinberg placed a telephone call to Sandefur. Steinberg asserted there was no legal basis for the position taken in the complaint. Eventually Steinberg said that he did not have the file in his office and so he did not know what had actually happened, and he said he would call back the following day.

The following day Steinberg and Sandefur spoke again. Steinberg advised Sandefur to send in the funds for the payment of the installments which were due and that defendant would waive any late charges, costs or fees associated with the problem and would reinstate the loan. Sandefur refused. He said, "We would want five hundred dollars in attorney fees." Steinberg refused to agree to pay attorney fees as a condition to receiving payment on the account and the conversation ended.

After speaking with Sandefur, Steinberg "made the determination that he [Sandefur] was not going to bring the loan current. He was not going to make any further payments and his position was that the debt had been extinguished in full and the lien had been terminated." In the meantime, Steinberg authorized foreclosure to proceed. Ultimately the property did not go to a foreclosure sale because the holder of the junior deed of trust cured the default by making the eight payments which had become overdue at the time, and by paying late charges and foreclosure fees.

Sandefur filed a supplemental complaint on behalf of plaintiffs. He sought damages for the negligent and/or intentional infliction of emotional distress. The bases for the claim were the sending of appraisers to the property, the filing of the notice of default, and the refusal to discuss the reasons for rejection of the original tenders. The case went to trial on the supplemental complaint, since at trial plaintiffs expressly abandoned the claim of the original complaint that the entire obligation and lien of the deed of trust were exonerated.

Trial was to the court. The court found in favor of plaintiffs. It awarded plaintiffs $2,250 in compensatory damages. Mrs. Gaffney was awarded $50,000 for emotional distress and pain and suffering. Mr. Gaffney was awarded $25,000 for mental distress and pain and suffering. The court awarded plaintiffs the sum of $250,000 for punitive and exemplary damages. The court further awarded attorneys fees and costs. The court subsequently awarded interest as to the entire judgment from June 21, 1984, pursuant to Code of Civil Procedure section 998.

### DISCUSSION

Defendant raises a host of objections to the judgment. Upon review we conclude the judgment is legally and factually unsupportable and must be reversed. In order to set forth our reasons for reversal we will recount the court's findings in the chronology of events which occurred and then explain the deficiencies in those findings.

The whole affair began when plaintiffs were attempting to borrow money to be secured by a second deed of trust. At that point they ceased making

payments on defendant's loan secured by the first deed of trust. From July 1st, when the first missed payment became due, until mid-September plaintiffs neither made their payments nor contacted defendant to inform them of the situation. On August 8th defendant informed plaintiffs in writing that they were in default and that unless they brought their loan current by September 8th foreclosure proceedings would be commenced. The letter closed: "If you have any questions, come see me or give me a call. I'll help if I can." Plaintiffs made no reply, nor did they attempt to make their overdue payments. The only communication defendant received during this period was a request for a statement of condition from Chicago Title Insurance Company. In early July defendant provided a statement of condition, good until August 9th, which set forth the status of the loan. On August 30th an employee of Chicago Title Insurance Company placed a telephone call to defendant to inquire whether further payments had been made and was informed none had. Thereafter, in mid-September, when the loan secured by a second deed of trust was consummated the title company used that information in submitting the July and August payments.[2]

■ The trial court found: "As a result of the requested status report, the reply of Downey and the August 30, 1983, call from Chicago Title to Downey requesting verification of the amount then due, Downey knew or should have known that funds would be paid to Downey at the close of escrow by Chicago Title Co." The finding ascribes an unreasonable degree of prescience to a creditor. A creditor is required, upon a proper request, to disclose information on the status of a secured obligation. (Civ. Code, § 2943.) This information, however, can be used for any number of things, including negotiations for the sale of the property, refinancing, or negotiations for the extension of loans secured by junior encumberances. To require a creditor to anticipate the purposes of a requested status report and the terms of any pending transaction would in effect require it to read the minds of its debtors. More importantly, even if the creditor did somehow divine the purpose for the statement of condition that fact would be legally irrelevant. Nothing a debtor does with respect to encumbering the property can have any legal effect on the rights of a senior creditor. Even if defendant did realize what plaintiffs were doing, its rights under the first deed of trust were not affected. Of course, upon request a creditor might extend an accomodation to a debtor under these circumstances, but neither plaintiffs

---

[2] In this respect it appears that the initial error, which led to all that followed, was committed by the title company or by the parties to the escrow. The statement of condition was by its terms valid only until August 9th. On August 30th a title company employee obtained a telephone update of the loan status. Escrow, however, did not close for approximately two more weeks, by which time the status of the loan had changed by the accrual of the September 1st payment which had not yet been paid. The amount of the tender by the title company on plaintiffs' behalf was insufficient to bring the account current at the time it was submitted.

nor anyone on their behalf contacted defendant to request such an accomodation or even to inform it of their situation. Defendant was not required on its own to forego its rights under the senior deed of trust as an accommodation to uncommunicative debtors. To the extent the trial court's finding implies wrongful conduct on defendant's part, it is erroneous.

When the escrow for the second secured loan closed, the title company sent a check for the July and August payments and late charges, and plaintiffs sent a check for the September payment in a separate envelope. Defendant was not notified that payment would be made in this manner. The attempted payments were processed separately, each was determined to be insufficient, and each was returned to plaintiffs. The court found that the tender of the full and correct amount due to defendant was made by plaintiffs, that the payment was rejected due to a defect in defendant's payment processing procedures, and that in rejecting the payments defendant failed to exercise due care and skill.

With apologies to Gertrude Stein, part payment is part payment is part payment. "An offer of partial performance is of no effect." (Civ. Code, § 1486.) ■ For that reason, "[n]othing short of the full amount due the creditor is sufficient to constitute a valid tender, and the debtor must at his peril offer the full amount." (*Rauer's Law etc. Co.* v. *S. Proctor Co.* (1919) 40 Cal.App. 524, 525 [181 P. 71]. See also *Lovetro* v. *Steers* (1965) 234 Cal.App.2d 461, 479 [44 Cal.Rptr. 604].) The doctrine of tender has been correctly summarized in this fashion: "The rules which govern tenders are strict and are strictly applied, and where the rules are prescribed by statute or rules of court, the tender must be in such form as to comply therewith. The tenderer must do and offer everything that is necessary on his part to complete the transaction, *and must fairly make known his purpose without ambiguity,* and the act of tender must be such that it needs only acceptance by the one to whom it is made to complete the transaction." (86 C.J.S., Tender, § 27, pp. 570-571, italics added and fns. omitted.) The evidence showed that defendant services approximately 40,000 loans. Since the 16th day of the month, the day when plaintiffs' payments arrived, is the last day payment may be made without late charges accruing, it is traditionally the day when the greatest number of payments arrive. Historically defendant receives 5,000 to 7,000 payments on that day. The trial court's finding would require defendant to coordinate all of those separate payments to discover whether, possibly, two separate part payments were submitted which together equal the amount due on a particular loan. The imposition of such an unreasonable burden is legally unwarranted. As the authorities establish, it is a debtor's responsibility to make an unambiguous tender of the entire amount due or else suffer the consequence that the tender is of no effect. ■ Plaintiffs' submission of two partial payments, without any

attempt to notify defendant that payments would be submitted in that manner, did not constitute a valid tender of the amounts due.

The checks were returned to plaintiffs with notices of payment error. Each of the notices stated that foreclosure was imminent, and advised plaintiffs to contact Marcie Figueroa for the amount due. At trial plaintiffs suggested these notices made their tenders sufficient pursuant to Civil Code section 1501, and Code of Civil Procedure section 2076.[3] ▮ The purpose of these provisions is to allow a debtor who is willing and able to pay his debt to know what the creditor demands so that the debtor may, if he wishes, make a conforming tender. (*Noyes* v. *Habitation Resources, Inc.* (1975) 49 Cal.App.3d 910, 914 [123 Cal.Rptr. 261, 82 A.L.R.3d 1192].) These statutory provisions do not apply where, as here, the amount of the creditor's demand is known to the debtor and the amount of the tender is wholly insufficient. (See *Thomassen* v. *Carr* (1967) 250 Cal.App.2d 341, 350 [58 Cal.Rptr. 297]; *Heimstadt* v. *Tapered Parts, Inc.* (1957) 155 Cal.App.2d 711, 714-715 [318 P.2d 689].) Moreover, these provisions are intended to enable a debtor to pay his debt without being later confronted with hidden objections which could have been obviated. Accordingly, reasonable compliance is what is required. (*Sanguansak* v. *Myers* (1986) 178 Cal.App.3d 110, 116-117 [223 Cal.Rptr. 490]; *Still* v. *Plaza Marina Commercial Corp.* (1971) 21 Cal.App.3d 378, 386 [98 Cal.Rptr. 414].) ▮ Defendant's customer service manager testified that when a loan is two months delinquent a notice is sent explaining what is required, the possibility of foreclosure, and the debtor's rights. Plaintiffs received such a letter in early August and were advised that the failure to make their account current by September 8th would result in the commencement of foreclosure action. The manager testified that when a loan account is three months overdue certain foreclosure costs and late charges may begin to accrue and for this reason an insufficient payment at that time is returned without specification of the exact amount due but with the notation that foreclosure is imminent and a request to contact a claims processor for the exact amount necessary to cure the default. Under the circumstances this is sufficient compliance with Civil Code section 1501 and Code of Civil Procedure section 2076.

Following plaintiffs' receipt of the returned checks they visited attorney Sandefur. He made a telephone call on plaintiffs' behalf. He was not given

---

[3] Civil Code section 1501 provides: "All objections to the mode of an offer of performance, which the creditor has an opportunity to state at the time to the person making the offer, and which could be then obviated by him, are waived by the creditor, if not then stated." Code of Civil Procedure section 2076 provides: "The person to whom a tender is made must, at the time, specify any objection he may have to the money, instrument, or property, or he must be deemed to have waived it; and if the objection be to the amount of money, the terms of the instrument, or the amount or kind of property, he must specify the amount, terms, or kind which he requires, or be precluded from objecting afterward."

the information concerning the amount necessary to make the loan account current. He urged plaintiffs to call defendant but they refused. Sandefur then opened an account at Bank of America and deposited the rejected payments and a sum sufficient for the October payment into the account. He wrote defendant to notify it of the account, to set forth his untenable view that by rejection of the payments the entire loan balance and deed of trust were exonerated, and to advise that he was filing a lawsuit to obtain that relief. ■ The court found "that the deposit of monies in the Bank of America trust account by Mr. Sandefur on or about October 7, 1983, pursuant to Civil Code section 1500 and the letter giving due notice of said deposit to defendant Downey bearing the same date . . . constituted an additional and second unconditional tender of all amounts then due and owing to defendant Downey."

The court's finding is contrary to the uncontroverted evidence. Compliance with Civil Code section 1500 requires that money deposited in an account be unconditionally available to the creditor. "The deposit contemplated by section 1500 of the Civil Code, the effect of which is an extinguishment of the obligation, is an unconditional deposit to the credit of the holder or owner of the obligation. . . . Money deposited under section 1500 [of the] Civil Code becomes at once the property of the person to whose credit it is placed . . . ." (*Righetti* v. *Righetti* (1907) 5 Cal.App. 249, 251 [90 P. 50]. See *Segno* v. *Segno* (1917) 175 Cal. 743, 744-745 [167 P. 285]; *Bourdieu* v. *Baker* (1935) 6 Cal.App.2d 150, 159 [44 P.2d 587].) Sandefur testified that he set up the account so defendant could not have unconditional access to it, but so it would require plaintiffs' signatures to release any funds to defendant. Mrs. Gaffney testified they gave the funds to Sandefur to hold for them and not for immediate payment to defendant. And Sandefur testified he had no intention of releasing the funds to defendant, and in the event defendant asked for the funds he would have filed a suit to determine whether it was entitled to them. This evidence establishes that plaintiffs did not comply with Civil Code section 1500 and their deposit of money in a bank account was not a tender of those funds to defendant.

Following Sandefur's letter to defendant neither party contacted the other. On November 21, 1983, Sandefur filed a complaint on plaintiffs' behalf. ■ The court found: "Said action was filed to determine the amounts due under the promissory note in an effort to forestall an imminent foreclosure and as a basis for obtaining a temporary restraining order and/or a preliminary injunction to prevent foreclosure should such action be instituted." Whatever Mr. Sandefur's hidden intentions may have been, his complaint cannot be recast through factual findings. Sandefur did not seek this form of relief in the complaint; instead, the sole assertion in the

complaint and the sole relief sought was the extinguishment of the entire promissory note and deed of trust.

After Sandefur mailed a copy of the complaint to defendant he was contacted by Steinberg. Steinberg asked Sandefur to remit the funds from the trust account and said that defendant would waive any late charges and other penalties and reinstate the loan. Sandefur refused and demanded that defendant agree to pay $500 in attorneys' fees. The court found the fees to be reasonable and that the demand was reasonable in light of the attorneys' fee clause in the promissory note. The court also found that the demand for payment of $500 did not constitute a revocation of the prior tenders. In fact, as we have already held, there had been no valid prior tenders. In any event, a party cannot place conditions upon a tender. (*Weiner* v. *Van Winkle* (1969) 273 Cal.App.2d 774, 782 [78 Cal.Rptr. 761].) When Steinberg refused to agree to pay attorneys' fees as a condition of receiving payment under the promissory note the proper course of conduct would have been for Sandefur to tender payment with a reservation of the right to seek attorneys' fees. (*Ibid.*) His refusal to submit payment unless defendant accepted his demands only served to reinforce the invalidity of the attempted tender.

Following his conversation with Sandefur, Steinberg authorized foreclosure to proceed. The court found: "Mr. Steinberg's testimony that he ordered foreclosure only because Mr. Sandefur insisted that the entire underlying debt was discharged lacks credibility." That was not Steinberg's testimony. On both direct and cross-examination he was asked why he approved foreclosure. On direct examination he cited Sandefur's position that the loan was exonerated as a factor he considered. However, on both occasions he gave as his reason for ordering foreclosure the fact plaintiffs would not release the funds from the bank account to bring the loan current and would not make further payments. On appellate review, the substantial evidence rule requires that the reviewing court "must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference, and resolving conflicts* in support of the judgment." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289, italics in original.) However, "[t]o these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities." (*Hicks* v. *Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788].)

██ Plaintiffs did not make an unconditional deposit of the funds due defendant into a bank account on its behalf. Steinberg, however, did ask for those funds to be released to bring the loan current. When Steinberg would not agree to pay $500 to Sandefur, Sandefur refused to release the funds from the bank account to bring the loan current. After the original deposit plaintiffs had neither attempted to make payment to defendant nor placed the funds for later payments into the account. And Sandefur had twice taken the position, in his letter to defendant and as the sole cause of action in his complaint, that the entire loan was exonerated. The conclusion that plaintiffs were not going to cure their default or make future payments was the only rational conclusion Steinberg could have reached after talking with Sandefur. His testimony did not lack credibility.

Following Steinberg's decision to authorize foreclosure, a notice of default was filed. ██ The court found that the recording of a notice of default breached defendant's duty of due care to plaintiffs and was done in bad faith. The court further found that it was malicious and oppressive and done with total disregard of the rights of the plaintiffs. From our earlier discussion it is clear this finding cannot stand. Plaintiffs had failed to make a valid tender of the sums due under the promissory note. Nevertheless, they had attempted to tender the monies due and Steinberg, on behalf of defendant, offered to accept the monies and to waive late charges and penalties and reinstate the loan. His offer was refused and it became clear that plaintiffs would neither make payment of past due amounts nor make future payments. Pursuant to California's one form of action rule (Code Civ. Proc., § 726; see *Passanisi* v. *Merit McBride Realtors, Inc.* (1987) 190 Cal.App.3d 1496, 1505-1506 [236 Cal.Rptr. 59]), foreclosure was the only remedy available to defendant. It did not act wrongfully in pursuing its only remedy.

In any event, even if we agreed with the trial court that defendant had been at fault in the matter, that agreement would not support the conclusion that its conduct was malicious and oppressive and undertaken with total disregard of the rights of the plaintiffs. Something more than the commission of a tort is required for punitive damages. (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854].) Consequently, an award of punitive damages is not supported simply upon a finding that the defendant violated its duty of good faith and fair dealing. (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103].) In order to justify punitive damages it must be found that the defendant is guilty of oppression, fraud or malice, that is, that it acted with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].) At the time defendant

recorded the notice of default on November 30, 1983, it had not been paid since the June payment. When Steinberg learned that plaintiffs had attempted to make the July, August and September payments in September he contacted their representative and offered to accept those payments and reinstate the loan but his offer was refused. It was clear plaintiffs would not make their past due or future payments. At the time of the notice of default plaintiffs were additionally in default on their October and November payments. Moreover, they neither tendered their November payment to defendant nor placed it in the trust account. Defendant's sole remedy was foreclosure and nothing in its attempt to pursue that remedy can be construed as evidence of oppression, fraud or malice.

During discovery plaintiffs propounded an interrogatory to defendant which asks: "Please state reason(s) for rejecting tender of July, August and September 1983 payments on Plaintiff's account No. 1-967091-8." Defendant answered: "The defendant, . . . rejected the payments made on or about September 21, 1983, for the July, August and September payments due under the Gaffney Loan No. 1-967091-8, based on the grounds that the amount tendered was insufficient to reinstate the loan. The amount due to reinstate the loan for the aforementioned July, August and September payments under the promissory note was the sum of $2,423.22."[4] The answer was signed by Steinberg as attorney and verified by A.J. Morsillo. Subsequently the trial attorney representing defendant wrote to plaintiff's counsel to state: "As I indicated to you at the latest Settlement Conference, the previous Interrogatory answer supplied by [defendant], with respect to the reason why the checks of the Gaffney's were rejected, was in error. I told you at that time that the actual reason the checks were rejected was because they came in 2 envelopes, were processed by the computer separately, and were each rejected on the basis that no one check, in and of itself, was an amount sufficient to cure. [¶] I hereby offer to stipulate to the above in open court. If you require an amended answer to the Interrogatory in order that [defendant] not be bound by its previous answer, please contact me immediately so that I may prepare such an amended answer." Plaintiffs accepted the stipulation.

 The court found that the first answer was false and was known to be false and was made in bad faith. The court found "that the said conduct

---

[4] This sum would appear to be erroneous in that it includes a late charge for the September payment of $37.74. In fact, late charges did not accrue to plaintiffs' payments if they were paid by the 16th of the month. Since plaintiffs' attempted payments did arrive at defendant's offices on September 16, late charges were not then due with respect to the September payment. This sum also appears to include an additional charge of $30. In the notice sent to plaintiffs in August 1983, defendant advised plaintiffs that if their payment to cure their default was made after September 1, 1983, then the payment must include a collection fee of $30. Since plaintiffs attempted to make payment after that date, and after the date for submission of the account to foreclosure, such a collection fee may have been imposed. However, defendant did not rely on such a fee as a basis for rejection of the payments in September 1983.

on the part of defendant Downey is further evidence of the willful and intentional disregard for the rights of plaintiffs." The first answer was incomplete. The payments submitted in September were rejected because they were insufficient, but the reason they were insufficient was because they were sent in separate envelopes and were processed separately. Steinberg testified that he assisted Morsillo in preparing the answers to the interrogatories and he believed the answer to be true when given. When he later discovered his error he immediately took steps to correct it. We fail to perceive how this scenario has any tendency in reason to establish bad faith and the willful and intentional disregard of plaintiffs' rights.

The court also found that "[a]t all times plaintiffs acted reasonably, were not negligent, and their actions or inactions did not contribute to any damages caused to plaintiffs by defendant Downey Savings." The implied covenant of good faith and fair dealing is a *mutual convenant*; it requires each of the contracting parties to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].) And as a standard for tort recovery all persons are required to act with reasonable regard for the protection of their own interests. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 684, p. 2969.) Plaintiffs' effort to obtain a junior secured loan could not legally affect defendant's right to payment on its senior encumberance. Nevertheless, plaintiffs quit making payments to defendant without notifying it of the reason. When defendant gave notice that plaintiffs were in default and their account would be sent into foreclosure unless they made payment by September 8th, plaintiffs disregarded the notice. When, after the date for submission of the account to foreclosure, the second secured loan was obtained plaintiffs made their regular September payment without advising defendant that payment to cure the default would be forthcoming from the escrow holder in another transaction. When plaintiffs received notices of payment error advising them to contact defendant they did not do so and refused to do so despite Sandefur's urging. They gave Sandefur funds for the July through October payments but did not give them to him for unconditional payment to defendant to cure their default. When defendant agreed to accept payment and waive late charges and penalties to reinstate the loan plaintiffs agreed with Sandefur's decision to refuse to make payment unless defendant agreed to pay attorneys' fees to them. And after the initial deposit of funds to a bank account plaintiffs failed to either make a tender to defendant or to place their later payments into the bank account so that when the junior creditor brought the loan out of default to protect itself plaintiffs were eight payments in default. This course of conduct cannot be termed reasonable and nonnegligent.

For these reasons we find the judgment in favor of plaintiffs is not supported by the law or the facts and cannot stand. It is therefore unnecessary for us to consider the remaining contentions on appeal.

The judgment is reversed and the cause is remanded to trial court with directions to enter a new and different judgment in favor of defendant. Defendant shall recover its costs on appeal.

Puglia, P. J., and Carr, J., concurred.

A petition for a rehearing was denied May 25, 1988, and respondents' petition for review by the Supreme Court was denied July 20, 1988.