**In re Denise FACHINI, Debtor.**

**No. 12–10199–JDW.**

United States Bankruptcy Court,
M.D. Georgia,
Albany Division.

Feb. 10, 2012.

James Robert Rogers, Macon, GA, pro se.

## MEMORANDUM OPINION

JAMES D. WALKER, JR., Bankruptcy Judge.

The Court considers the matter of this involuntary petition *sua sponte.* This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(A), (O). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

On February 9, 2012, James Robert Rogers filed an involuntary Chapter 7 petition against Denise Fachini. On the petition, Mr. Rogers listed a claim against Ms.

Fachini in the amount of $10 million. He attached to the petition a UCC–3, which is an amendment to a UCC financing statement, and three documents addressed to the Secretary of the United States Treasury Department. In summary, the documents first demand the Secretary to pay Ms. Fachini $10 million from Mr. Rogers' U.S. Treasury trust account and then demand a chargeback of that amount to be deposited back into Mr. Rogers' trust account. The UCC filing cites dishonor of the chargeback.

The three documents addressed to the Secretary are dated September 10, 2011, and all reference HJR–192. First is an "International Bill of Exchange" labeled with invoice number JRR 9102011 8758 1919 9741. It names the Treasury Department as the Drawee, Ms. Fachini as the Payee, and Mr. Rogers as the Drawer/Maker. In the document, Mr. Rogers directs the Secretary to pay Ms. Fachini $10 million "from my UCC CONTRACT TRUST ACCOUNT NO. [redacted].[1] This is in accord with PUBLIC POLICY 73–10 and HJR–192."

Second is a "Charge Back" that provides as follows:

> I have accepted for value all related endorsements in accordance with U.C.C. 3–419 and HJR–192. Please charge my UCC Contract Trust Account ... for the registration fees and command the memory of account number [redacted] to charge the same, to the debtors Order, or your Order.
>
> The total amount of this Bill of Exchange in the enclosed filing is $10,000,000 (Ten Million Dollars) and attached to said Birth Certificate instrument is the Birth Certificate Bond for

Set Off for deposit into the UCC Contract Trust Account Number [redacted].

Third is a letter to the Secretary regarding the chargeback. The letter states:

> Please "Charge–Back (deposit) into my "UCC Contract Trust Account, [redacted], $10,000,000.00 (Ten Million Dollars) and charge my account for the fees necessary for securing and registration for the priority exchange for the tax exemption to discharge the public liability of my personal possessions, and command memory of account no. [redacted] to charge the same to the debtors order or your order.
>
> . . .
>
> With this POSTED transaction the "CHARGEBACK" documented by the enclosed forms are for use by the Republic and is complete.

Finally, Mr. Rogers filed the UCC–3 with the Clerk of the Superior Court of Crisp County, Georgia, on February 6, 2012. In Box 8, titled "AMENDMENT (COLLATERAL CHANGE)," he wrote the following:

> This Statement is an assignment of Collateral or Product of Collateral ... in which debtor holds all interest. This amendment partially releases and Partially assigns the value of the DISHONOR of the Invoice/Actual and Constructive Notice by DENISE FACHINI, ... INVOICE NO. JRR 9102011 8758 1919 9741[.]

At issue in this case is whether or not the involuntary petition was properly commenced. Because the Court finds that Mr. Rogers does not hold a valid claim against Ms. Fachini, the case will be dismissed.

---

1. The Court has redacted the account number because it appears to be Mr. Rogers' Social Security Number.

## Conclusions of Law

Section 303 of the Bankruptcy Code governs involuntary petitions. An involuntary petition may be commenced by an entity that "is either a holder of a claim against [the debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder." 11 U.S.C. § 303(b). A "claim" is defined as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

On the petition, Mr. Rogers alleges he holds a "commercial" claim against Ms. Fachini in the amount of $10 million. The documents filed by Mr. Rogers to support his claim only serve to undermine it by revealing it to be a sham. Mr. Rogers purported to write Ms. Fachini the equivalent of a check (the bill of exchange) for $10 million drawn on his account with the U.S. Treasury. There is no indication that he ever tendered the check to Ms. Fachini or that she ever presented it for payment. Nevertheless, Mr. Rogers sought a chargeback of the $10 million dollars on the same date that he issued the bill of exchange. He then filed a UCC–3 statement indicating the chargeback had been dishonored. Nothing in the documents indicates why Mr. Rogers issued the bill of exchange to Ms. Fachini or why she was obligated to return the funds to him.

More importantly, the bill of exchange had no legal effect. Other courts have found bills of exchange purporting to be drawn against a trust account at the U.S. Treasury to be "nothing more than a string of words that sound as though they belong in a legal document, but which, in reality, are incomprehensible, signifying nothing." *McElroy v. Chase Manhattan Mortg. Corp.*, 134 Cal.App.4th 388, 393, 36 Cal.Rptr.3d 176 (Cal.App. 4 Dist.2005). *See also Bryant v. Washington Mutual Bank*, 524 F.Supp.2d 753 (W.D.Va.2007); *Hennis v. Trustmark Bank*, No. 2: 10CV20–KS–MTP, 2010 WL 1904860 (S.D.Miss. May 10, 2010) (collecting cases). Even the Treasury Department has issued an alert about fraudulent bills of exchange. *See* "Bogus Sight Drafts/Bills of Exchange Drawn on the Treasury," available online at http://www.treasurydirect.gov/instit/statreg/fraud/fraud_bogussightdraft.htm (noting that "bills of exchange drawn on the U.S. Treasury Department ... have been used in an attempt to pay for everything from cars to child support.... All these Bills of Exchange drawn on the U.S. Treasury are worthless.").

In *Bryant*, the plaintiffs were homeowners who attempted to use a bill of exchange drawn on a "contract trust account" to pay off their mortgage. The mortgage company refused to accept the draft and foreclosed on the home. The court found the bill of exchange was not a legitimate negotiable instrument. *Id.* at 758. The court attempted to summarize the argument for these so-called trust accounts as follows:

Supposedly, prior to the passage of the Fourteenth Amendment, there were no U.S. citizens; instead people were citizens only of their individual states. Even after the passage of the Fourteenth Amendment, U.S. citizenship remains optional. The federal govern-

ment, however, has tricked the populace into becoming U.S. citizens by entering into "contracts" embodied in such documents as birth certificates and social security cards. With these contracts, an individual unwittingly creates a fictitious entity (i.e., the U.S. citizen) that represents, but is separate from, the real person. Through these contracts, individuals also unknowingly pledge themselves and their property, through their newly created fictitious entities, as security for the national debt in exchange for the benefits of citizenship. However, the government cannot hold the profits it makes from this use of its citizens and their property in the general fund of the United States because doing so would constitute fraud, given that the profits technically belong to the actual owners of the property being pledged (i.e., the real people represented by the fictitious entities). Therefore, the government holds the profits in secret, individual trust accounts, one for each citizen.

*Id.* at 758–59 (internal footnote omitted). In 1933, the government provided a means for citizens to recover the profits held in their trust accounts through House Joint Resolution 192 [2] and the Uniform Commercial Code. *Id.* at 759. Although the remedy is kept secret so the government can retain the profits, a person "who learns of and is able to implement the remedy, can supposedly use the debt owed to her by the government to discharge her debts to third parties with Bills of Exchange that are drawn on her trust account." *Id.*

The court dismissed this theory—known as redemption theory—as "nonsense in almost every detail." *Id.* at 760. It found no legal support for this argument and

instead concluded that the debtor had tendered to the mortgage company "a worthless piece of paper." *Id.* Furthermore, the court warned the debtor that "people frequently end up in prison" for passing bills of exchange drawn against the U.S. Treasury. *Id.* at 763.

Based on the foregoing, the Court is persuaded that Mr. Rogers' UCC Contract Trust Account is completely fictitious. Therefore, the bill of exchange drawn on the account and the subsequent chargeback have no legal effect and are not sufficient either to create a right to payment or to create an equitable remedy for breach of performance that gives rise to a right to payment. Consequently Mr. Rogers does not hold a claim as defined in 11 U.S.C. § 101(5) against Ms. Fachini and does not meet the requirements to file an involuntary bankruptcy petition against her.

■ An opinion of the Eleventh Circuit Court of Appeals raises some question about whether the Court can consider the requirements of § 303(b) on its own motion. In *Trusted Net Media Holdings, LLC v. The Morrison Agency, Inc. (In re Trusted Net Media Holdings, LLC)*, 550 F.3d 1035 (11th Cir.2008), the court said,

[t]here is no indication from the text of § 303 that Congress intended bankruptcy courts to consider *sua sponte* at any point in the proceedings whether the involuntary petition filing requirements have been met. In fact, the statutory language strongly suggests the opposite. Section 303(h) provides that if an involuntary petition "is not timely controverted, the court *shall order relief against the debtor* in an involuntary case under the chapter under which the petition was filed."

2. As noted in the Findings of Fact, all the documents Mr. Rogers addressed to the Treasury Department referred to HJR 192. HJR

192 "addresses nothing more than the U.S. monetary shift away from the gold standard[.]" 524 F.Supp.2d at 760.

*Id.* at 1044 (quoting 11 U.S.C. § 303(h)) (emphasis in original). However, *Trusted Net* differs significantly from this case.

The debtor in *Trusted Net* did not object to the involuntary petition until four years after the petition was filed. *Id.* at 1037. At that time, the debtor argued the debt of the petitioning creditor (who claimed to be the debtor's only creditor) was subject to a bona fide dispute, and because the petition was not filed by the holder of an undisputed noncontingent claim, the bankruptcy court had no subject matter jurisdiction over the case. *Id.* at 1037–38. Thus, the issue under consideration by the *circuit* was whether § 303 implicates the court's subject matter jurisdiction. *Id.* at 1038. The circuit court held that it does not. *Id.* at 1043. The lack of a statutory mechanism for *sua sponte* review of involuntary petitions was a factor in support of the court's holding on jurisdiction. *Id.* at 1045. However, it does not necessarily preclude a *sua sponte* inquiry in all circumstances. Here, there is no dispute over the validity of the debt that requires a factual inquiry. On the contrary, petition is invalid on its face because the petitioning creditor's claim is founded on a financial instrument that has been ruled illegitimate as a matter of law by multiple state and federal courts and has been declared worthless by the Treasury Department. To assume such a claim is valid would give dignity to Mr. Rogers' efforts to fabricate a debt and invoke the bankruptcy process for an improper purpose (or at least some purpose that has no relationship to collecting a legitimate debt). In these circumstances, any delay in the disposition of this case would constitute a manifest injustice to Ms. Fachini and would transform the ideal of due process into an instrument of chicanery. For the foregoing reasons, the Court will dismiss this case.

An Order in accordance with this Opinion will be entered on this date.