Filed 5/13/16  Nunn v. JPMorgan Chase Bank CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GERALD L. NUNN et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A.[1] et al, <br><br>     Defendants and Respondents. | A139718 <br><br> (Napa County <br> Super. Ct. No. 2656767) |

Gerald L. Nunn and Judith Nunn brought an action against respondents JPMorgan Chase Bank, N.A. (Chase) and California Reconveyance Company (CRC) alleging irregularities in the processing of their requests for loan modification.  They appeal following the court's entry of summary judgment in favor of respondents.  We conclude that there is a triable issue of fact as to whether the Nunns complied with the terms of a trial plan agreement (TPA) for loan modification.  We also conclude that the Nunns can allege a cause of action for negligence based on respondents' obligation to exercise due care in the processing and review of their loan modification application.  We therefore remand the matter for further proceedings.

### I.  FACTUAL BACKGROUND

The Nunns are the owners of a property on Seminary Street in Napa.  In July 2006, they refinanced their mortgage through Washington Mutual Bank, F.A. (WaMu) in the

---

[1] The Nunns erroneously sued JPMorgan Chase Bank, N.A. as J.P. Morgan Chase & Company.

1

amount of $900,000. They obtained approximately $200,000 in cash out from the transaction. They used $100,000 of that cash to purchase a Napa property on El Monte Way for $880,000.[2]

The WaMu mortgage was a negative amortization loan in which paying only the minimum monthly payments resulted in an increase to the principal balance. In August 2008, the minimum monthly payment increased from $2,876.80 to $4,286.23. The Nunns defaulted on the loan by failing to make their September 2008 payment.

By October 2008, the Nunns were in communication with Chase[3] regarding a loan modification application. On January 28, 2009, the Nunns submitted a request to Chase for a loan modification. On July 28, 2009, they signed a TPA with Chase under which they agreed to make three payments of $3,767.74 in each of three consecutive months beginning on August 1, 2009. The Nunns made the first payment on July 31, 2009, but did not make the second and third payments until the first week of November 2009.

Chase continued to process the Nunns' loan modification application and requested additional documentation. On March 5, 2010, Chase notified the Nunns that they were ineligible for the Home Affordable Mortgage Program (HAMP) or other loan modification programs offered by Chase due to the net present value (NPV) calculation.[4]

In July 2010, the Nunns reapplied for a loan modification through the HAMP program. On August 16, 2010, Chase again denied their request finding that they did not qualify for a modification because the current unpaid principal balance on their loan was higher than the program limit. The Nunns submitted yet another request for a loan

---

[2] The Nunns' mortgage on the El Monte Way property is the subject of another appeal pending between the parties, *Nunn v. JP Morgan Chase Bank, N.A.* (A146419).

[3] Chase purchased the WaMu mortgage on or about September 25, 2008 pursuant to a Purchase & Assumption Agreement entered into with the Federal Deposit Insurance Corporation (FDIC).

[4] The NPV calculation is " ' "essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure." [Citation.]' " (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 787 (*West*).)

2

modification but it, too, was denied on November 19, 2010. Chase also denied this request on the ground that the current unpaid principal balance on the loan exceeded the program limit.

The Nunns continued to seek a loan modification, and in January and February 2011, Chase requested additional documentation to consider the request. On April 7, 2011, Chase denied the Nunns' request on the ground that they did not provide the requested documents.

On April 21, 2011, CRC recorded a notice of default on the property, indicating that the Nunns owed back payments of $146,029.04 as of April 15, 2011.

On April 17, 2011, the Nunns sought reconsideration of Chase's denial of the loan modification. Chase's phone logs for May and July 2011 indicate that the Nunns' loan modification was still being evaluated. Ultimately, Chase never completed the evaluation because the Nunns filed this action on August 3, 2011.

The Nunns' complaint sought injunctive and declaratory relief and damages for several causes of action including misrepresentation, fraud and deceit, quiet title, negligence, and negligent and intentional infliction of emotional distress. The court sustained Chase's demurrer to the complaint and a first amended complaint was filed on December 5, 2011 alleging the same causes of action. In their negligence and negligent infliction of emotional distress causes of action, the Nunns alleged that respondents engaged in "dual tracking"—evaluating their application for a loan modification while pursuing foreclosure—and that respondents failed to exercise due care in evaluating their application, told them to forgo making mortgage payments, and then used their default to begin foreclosure. Respondents demurred to the first amended complaint. The court sustained, without leave to amend, the demurrer to the following causes of action: declaratory relief and quiet title, negligence, negligent infliction of emotional distress, and violation of Civil Code section 1788.17 (false representations in the servicing and collection of debt by the debt collector). The court overruled the demurrer to the remaining nine causes of action.

3

On April 11, 2013, respondents moved for summary judgment contending that there were no triable issues of fact; they contended the evidence showed they did not engage in any wrongdoing and that they did not owe the Nunns any duty with respect to their claim for negligent infliction of emotional distress. In support of their motion, respondents submitted a declaration from Araceli Urquidi, a senior research specialist for Chase, which attached numerous documents from the Nunns' loan file. Respondents also submitted a declaration from their attorney authenticating discovery responses and excerpts of depositions. The Nunns opposed the motion, offering evidence that their signatures on the deed of trust and promissory note were forged, and arguing that respondents were negligent, breached their fiduciary duties, misrepresented facts, committed fraud, and breached the covenant of good faith and fair dealing. The Nunns also presented evidence and argument that respondents intentionally inflicted emotional distress and violated unfair competition laws.

The trial court granted summary judgment, finding that the Nunns' forgery claim was barred because they did not allege that claim in their complaint. With respect to their remaining causes of action, the court concluded that the Nunns: (1) failed to submit evidence to support their argument that Chase did not acquire interests in the deed of trust or promissory note; (2) failed to submit any evidence of harm "beyond simply being distressed" on their claim for intentional infliction of emotional distress; (3) failed to submit any evidence regarding damages on their claim for breach of the implied covenant of good faith and fair dealing; (4) failed to submit evidence, on their cause of action for promissory estoppel, or on their claims that their credit was harmed and that they forwent bankruptcy protections or alternative lending opportunities; (5) failed to show a triable issue with respect to damages or causation on their fraud and unfair competition claims; and (6) failed to show they were entitled to injunctive relief.

## II.  DISCUSSION

### A.  *Standard of Review*

The standard of review of a summary judgment motion in favor of a defendant is well settled. We review the trial court's ruling de novo. (*Barber v. Chang* (2007) 151

4

Cal.App.4th 1456, 1462–1463.) We "independently assess the correctness of the trial court's ruling by applying the same legal standard as the trial court in determining whether any triable issues of material fact exist, and whether the defendant is entitled to judgment as a matter of law." (*Rubin v. United Air Lines, Inc.* (2002) 96 Cal.App.4th 364, 372.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the [plaintiff] in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted (*Aguilar*).) The trial court must view that evidence, and any reasonable inferences from that evidence, "in the light most favorable to" the plaintiff. (*Id.* at p. 843.)

Thus, in considering a motion by a defendant, "we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial . . . ." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) A defendant has met his burden of showing that a cause of action has no merit if he shows that one or more elements of the plaintiff's cause of action cannot be established. (*Aguilar, supra,* 25 Cal.4th at p. 849.) Once the defendant carries that burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact. (*Ibid.*, see *Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 940; *Binder v. Aetna life Ins. Co.* (1999) 75 Cal.App.4th 832, 840 [responding plaintiff has no evidentiary burden unless moving defendant has first met initial burden].) In order to meet its burden on a claim for which the plaintiff would have the burden of proof by a preponderance of the evidence, "the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see *Aguilar*, *supra,* 25 Cal.4th at p. 850.)

5

" 'A different analysis is required for our review of the trial court's . . . rulings on evidentiary objections. Although it is often said that an appellate court reviews a summary judgment motion "de novo," the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard. [Citations.]' [Citation.]" (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335 (*Miranda*); accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.) A trial court abuses its discretion only when it exceeds the bounds of reason. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679.) We consider and construe liberally only admissible evidence in deciding whether there is a triable issue of fact. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761.)

### B. Evidentiary issues

In support of their summary judgment motion, respondents submitted a request for judicial notice of the deed of trust on the property, the purchase and assumption agreement, the notice of default and election to sell under the deed of trust on the property, the notice of trustee's sale, and the deed of trust, assignment of deed of trust, and notice of default and election to sell for the El Monte Way property. Respondents also submitted the Urquidi declaration attaching and identifying documents from the Nunns' loan file. The Nunns contend that the trial court abused its discretion in granting respondents' request for judicial notice and admitting the Urquidi declaration.

First, the Nunns assert that the court improperly considered as true the statements contained in the documents of which it took judicial notice. As explained in *Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256 (*Fontenot*), disapproved on other grounds in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924, pursuant to Evidence Code section 452, subdivisions (c) and (h), courts may take judicial notice of recorded real property documents, including deeds of trust. "The official act of recordation and the common use of a notary public in the execution of such documents assure their reliability, and the maintenance of the documents in the recorder's office makes their existence and text capable of ready confirmation, thereby placing such

6

documents beyond reasonable dispute." (*Id.* at pp. 264–265.) Courts take judicial notice not only of the existence and recordation of recorded documents but also of the matters that can be deduced from the documents. (*Id.* at p. 265.) Thus, while recognizing that it is improper to take judicial notice of the truth of statements of fact recited in documents, the court in *Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117–1118, took judicial notice of the legal effect of the language in recorded documents in a real estate transaction. Similarly, in *McElroy v. Chase Manhattan Mortgage Corp.* (2005) 134 Cal.App.4th 388, 394, the court took judicial notice of the date of the recordation of a notice of default, and the amount stated as owing in the notice. Hence, in the present case, the court did not abuse its discretion in taking judicial notice of the existence of and the date of the recorded documents.

The Nunns next argue that the trial court abused its discretion in admitting the Urquidi declaration because it is hearsay and the declarant did not adequately establish her credentials to satisfy the business records exception. We disagree. Urquidi declared that the information contained in the declaration was true and correct to the best of her knowledge and that she was competent to testify to that information. (See *Herrera v. Deutsche Bank National Trust Co.* (2011) 196 Cal.App.4th 1366, 1376.) She also established the foundational elements for the business record exception to the hearsay rule.[5]

Bank records are generally admissible as business records. (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 524.) Here, Urquidi asserted in her declaration that she was a "Sr. Research Specialist" for Chase and had signing authority as an Assistant Secretary. She stated she had reviewed the business records attached to the declaration

---

[5] Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

and had access to the records maintained by Chase as part of her job responsibilities.[6] These responsibilities included reviewing loan origination files, loan histories, collateral files containing endorsed copies of promissory notes and deeds of trusts, correspondence histories, foreclosure files and recorded notices, and loss mitigation files. She further stated that the records were "prepared and/or received in the ordinary course of the respective business of Chase [and that each] of the documents was made or received at or near the time of the occurrence or events they record." She thus established the foundational elements for the business record exception in that she provided the sources of the information and the manner and time of preparation which demonstrated trustworthiness. (Evid. Code, § 1271, subd. (d).)

The Nunns argue that the Urquidi declaration is hearsay because the declarant lacks personal knowledge of the matters contained in the declaration and was not the custodian of records. Chase was not required to submit a declaration by its custodian of records in order to gain admissibility of the business records. The business records statute permits any qualified witness to establish the conditions of admissibility. (Evid. Code, § 1271, subd. (c).) "It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or event." (*Loper v. Morrison* (1944) 23 Cal.2d 600, 608–609.) "The witness need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed . . . ." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322.) Urquidi established that she had reviewed the documents and was familiar with the loan and foreclosure procedures. Her declaration thus met the conditions of admissibility for business records. (*Ibid.*)

---

[6] In light of this statement in the declaration, the Nunns' argument that the declaration did not state that Urquidi was an employee of Chase is specious. In addition, Urquidi was not required to show that she was employed by Chase at the time the loan transactions occurred. (See *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1449 [laboratory report authenticated by witness familiar with blood collection procedures even though technician who performed tests was not called as a witness].)

Finally, the Nunns challenge the Urquidi declaration's inclusion of the purchase and assumption agreement drafted by the FDIC, the notices of default, and the notices of trustee's sale which were prepared by CRC. As we have already discussed, the court properly took judicial notice of these documents. (See *Fontenot*, *supra*, 198 Cal.App.4th at p. 265.) That they were also available as attachments to the Urquidi declaration is irrelevant.

### C. Forgery

The Nunns next contend that the trial court erred because it refused to consider the claim that their signatures on the deed of trust and on the promissory note were forged. They argue that respondents could not proceed with foreclosure because they were not proceeding under a deed of trust and promissory note that were valid. This argument fails as the Nunns acknowledged in their verified first amended complaint that this action involved "their deed of trust." In addition, the signatures on the deed of trust were notarized. The notary's acknowledgement is prima facie evidence that the Nunns signed the deed of trust. (Evid. Code, § 1451.) Further, the Nunns testified that they signed the deed of trust but could not verify that it was their signature on the document at their depositions. It is simply disingenuous of them to claim that their signatures are forged on a deed of trust and loan which have been in existence since 2006, and which the parties have relied upon in the loan transaction at issue.

Moreover, the Nunns' claim is barred because they did not plead a cause of action for forgery in their complaint and raised this claim only at the eleventh hour in opposition to respondents' motion for summary judgment. Indeed, their first amended complaint was premised on the allegations that they were entitled to relief based on the loan and deed of trust they now claim contains their forged signatures. Commercial Code section 3308 provides that "[i]n an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings." The Nunns argue that this provision is inapplicable because the Commercial Code does not apply to deeds of trust or foreclosures. They are mistaken. While we recognize that " '[t]he comprehensive statutory framework established in [Civil

9

Code sections 2924–2924k] to govern nonjudicial foreclosures sales is intended to be exhaustive' " (*Debrunner v. Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, 440 (*Debrunner*)), Commercial Code section 3308's requirement that the authenticity of a signature is admitted unless denied in the pleadings is not inconsistent with nor is it imposing an additional requirement for initiation of a nonjudicial foreclosure.  (See *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1154, fn. 5 [plaintiff's action to determine whether the owner of a promissory note authorized its nominee to initiate a foreclosure was inconsistent with the policy of an efficient and inexpensive remedy of nonjudicial foreclosure].)[7]  The Nunns did not claim in their first amended complaint that their signatures on the deed of trust and promissory note were forged.  Their belated attempt to do so in their opposition to summary judgment fails.

### D.  *Intentional Infliction of Emotional Distress*

The trial court ruled that the Nunns could not recover for intentional infliction of emotional distress because they had not submitted any evidence of harm beyond simply being distressed.  The Nunns contend this was error.  They argue that Chase never intended to approve their loan modification and "strung them along" with an intent to cause them emotional distress.

We agree with the trial court that the Nunns failed to show a triable issue of material fact on their emotional distress claims.  The elements of a cause of action for intentional infliction of emotional distress are:  " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " (*Christensen v. Superior Court* (1991) 54 Cal.3d

---

[7] We note that Commercial Code section 3301 pertaining to the persons entitled to enforce a note does not govern nonjudicial foreclosures under deeds of trust.  (See *Debrunner, supra,* 204 Cal.App.4th at pp. 440–441.)

868, 903.) The outrageous conduct " 'must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Ibid.*)

Here, while we acknowledge that the Nunns experienced several personal tragic events resulting in emotional distress during the loan modification process, including the death of their son and the death of Mr. Nunn's father, their distress was not the result of any outrageous conduct by respondents. Moreover, emotional distress damages are not available for economic loss. (See *Erlich v. Menezes* (1999) 21 Cal.4th 543, 557–558 (*Erlich*) [emotional distress damages not available in case involving negligent construction of house where there was no physical injury]; *Quinteros v. Aurora Loan Servs.* (E.D.Cal 2010) 740 F.Supp.2d 1163, 1172 [act of foreclosing on home, absent other circumstances, is not the kind of extreme conduct that supports an intentional infliction of emotional distress claim].)

*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, upon which the Nunns rely, is distinguishable. There, the plaintiff alleged that her mortgage broker forged her signature on her loan documents and when she informed the bank, it urged her not to make her April payment while it investigated the incident. (*Id.* at pp. 188–189.) In reliance on the bank's statements, she cancelled her scheduled loan payment only to receive a delinquency notice. (*Id.* at p. 188.) When she called to inquire about the delinquency, she was told that the bank could not collect payments from her while the forgery investigation was ongoing. (*Id.* at pp. 188–189.) The bank thereafter instituted foreclosure proceedings and refused to accept her proffered payment. (*Id.* at p. 189.) The court of appeal held that bank's treatment of the plaintiff exceeded all bounds of decency and reversed summary judgment on the plaintiff's claim. (*Id.* at pp. 205, 209.)

Here, the same level of egregiousness is simply not present. Chase allowed the Nunns to apply repeatedly for loan modification relief; its actions do not even approach the level of outrageous conduct upon which an emotional distress claim can be predicated.

11

### E. *Implied Covenant of Good Faith and Fair Dealing*

The trial court found there were triable issues of fact as to whether the Nunns complied with the terms of the TPA and whether the TPA required Chase to offer them a loan modification. Yet, it granted summary judgment on the breach of implied covenant of good faith and fair dealing cause of action, finding that the Nunns had failed to show there was a triable issue of material fact on whether they suffered damages. This was error.

It is well settled that " ' "every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." ' [Citations.]" (*Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 299, 308 (*Rufini*).) The Nunns contend that respondents breached the implied covenant of good faith and fair dealing by not adhering to the terms of the TPA.

The Nunns claim that Chase should have modified their loan based on their compliance with the TPA because it was a HAMP modification. HAMP is the Home Affordable Mortgage Program implemented by the United States Department of the Treasury. (*West, supra,* 214 Cal.App.4th at p. 785.) " 'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' " (*Ibid.*, quoting *Bosque v. Wells Fargo Bank, N.A.* (D.Mass. 2011) 762 F.Supp.2d 342, 347.) Under HAMP, a trial plan agreement must be interpreted to include a provision that the bank will offer the mortgagee a permanent loan modification if he or she complies with the agreement's terms. (*West, supra,* 214 Cal.App.4th at pp. 797–798.)

Chase maintained that the Nunns had not made the payments as scheduled in the TPA, while the Nunns urged that Chase intentionally or negligently blocked timely payment by providing the wrong code or changing the code for wiring funds. The Nunns timely made the first payment but did not make the second and third payments until the first week of November 2009.

"[C]ompliance with a [Trial Period Plan (TPP)] can give rise to an enforceable agreement to permanently modify a loan." (*Rufini, supra,* 227 Cal.App.4th at p. 307.) In *Rufini,* the court held that the plaintiff stated a claim for breach of contract and wrongful foreclosure when he alleged that the bank did not offer him a permanent loan modification although he made the three trial payments pursuant to a loan modification agreement. (*Id.* at pp. 304–308.) The court held that although the complaint did not allege that the modification plan was pursuant to a TPP or HAMP modification, the plaintiff was entitled to leave to amend his complaint to that effect. (*Id.* at p. 306.) The court further held that if the plaintiff alleged sufficient facts to show that the bank was obligated to modify the loan, he could also be granted leave to allege a claim for breach of the implied covenant of good faith and fair dealing based on the bank's refusal to modify. (*Id.* at p. 308; and see *West, supra,* 214 Cal.App.4th at pp. 798–799 [borrower who complied with trial plan agreement stated a cause of action for breach of contract where she alleged that bank failed to offer a permanent loan modification].)

Here, the evidence before the court included a TPA signed by the Nunns requiring three payments of $3,767.74 on August 1, September 1, and October 1 of 2009. While the agreement provided that if payments were made as scheduled, Chase would reevaluate their application and determine if it could offer the Nunns "a permanent workout solution to bring your loan current," the courts have held that under HAMP, if a borrower has made all required trial payments and complied with the TPP's other terms, the lender must offer the borrower a permanent loan modification. (*Rufini, supra,* 227 Cal.App.4th at p. 306 and cases cited.) Here, the court found that there was a triable issue of fact as to whether the Nunns complied with the TPA and whether the TPA required Chase to offer the Nunns a loan modification upon compliance. Under recent authority, it is at least arguable that a lender must offer a permanent loan modification to a borrower who complies with a TPA. The trial court therefore erred in granting

13

respondents' summary judgment on their implied covenant of fair dealing cause of action. (*Ibid.*)[8]

### F. The Ben-Zion declaration

The Nunns submitted the declaration of Barry Ben-Zion, a forensic economist, in support of their opposition to respondents' motion for summary judgment. Ben-Zion offered an opinion on an objective definition of an affordable monthly mortgage payment. Respondents objected to the admission of the declaration on the ground that it lacked foundation as Ben-Zion relied on Chase's current website page on "How much home can I afford?" and offered no evidence that the information on the current website reflected what existed on the website at the time the Nunns were allegedly promised a modification. Respondents also objected to the declaration on the ground that it was irrelevant as Chase never promised the Nunns' an "affordable modification," and that its probative value was outweighed by the risks of undue prejudice and confusion of the issues. Finally, it objected to the exhibit of Chase's website attached to the declaration as inadmissible hearsay. The trial court sustained the objections.

The Nunns assert that the trial court should have admitted the declaration. We disagree. The Ben-Zion declaration simply related a definition of an affordable monthly mortgage payment as being based on a debt to income ratio of 36 percent or less. Ben-Zion offered no opinion on whether the Nunns would have qualified for a loan modification within those parameters. Nor did the Nunns submit any evidence that they would have been able to afford a mortgage with a debt to income ratio of 36 percent. The declaration was thus not relevant to the issue of whether the Nunns qualified for a loan modification.

---

[8] At oral argument, respondents' counsel asserted that plaintiffs had not alleged they applied for a HAMP loan modification and that nothing in the TPA indicated it was offered as part of a HAMP loan modification. But Chase itself, in its Statement of Undisputed Material Facts, stated that "Plaintiffs were denied for loan modification *under HAMP* and Chase's internal loan modification programs . . . ." (Italics added.) On the record as a whole, the trial court correctly found that whether the bank was required to offer a loan modification if the borrowers complied with the TPA was a question of fact.

14

## G.  Negligence

The trial court sustained respondents' demurrer to the Nunns' causes of action for negligence and negligent infliction of emotional distress on the ground that the Nunns failed to allege facts to show that respondents owed them a duty of care.  Relying on *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 898–901, the Nunns argue that respondents owed them a duty of care in the loan modification process.  The *Jolley* case involved a construction loan contract in which the court held that the borrower stated a cause of action for negligence.  (*Id.* at pp. 898, 906.)  The court concluded that the bank owed the plaintiff a duty to review his request for a loan modification in good faith because there was an ongoing dispute about the bank's performance and its disbursement of monies due under the loan contract and the bank's representative had made specific representations as to the likelihood of a loan modification.  (*Id.* at pp. 899–900.)  The *Jolley* court distinguished a residential home loan where the general rule is a financial institution owes no duty of care to a borrower when it is a mere lender of money:  "We note that we deal with a construction loan, not a residential home loan where, save for possible loan servicing issues, the relationship ends when the loan is funded.  By contrast, in a construction loan the relationship between lender and borrower is ongoing, in the sense that the parties are working together over a period of time, with disbursements made throughout the construction period, depending upon the state of progress towards completion."  (*Id.* at p. 901.)

The *Jolley* case was criticized in *Lueras v. BAC Home Loan Servicing, LP* (2013) 221 Cal.App.4th 49, 67 "to the extent it suggests a residential lender owes a common law duty of care to offer, consider, or approve a loan modification."  The *Lueras* court thus declined to impose a duty of care in the handling of residential loan modification negotiations or servicing.  (*Ibid.*)  It, however, granted the plaintiffs leave to amend their complaint to allege a cause of action for negligent misrepresentation, concluding that a lender does owe a duty to a borrower to not make material misrepresentations about the status of a loan modification or the status of a foreclosure sale.  (*Id.* at pp. 68–69.)

15

More recently, in *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 944–945, Division Three of this appellate district held that a bank owes a borrower a duty of care in negotiating or processing an application for a loan modification. Applying the balancing factors of *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650[9] for determining whether a lender owes a borrower a duty of care, the court concluded that because the bank had allegedly agreed to consider modification of the plaintiffs' loans, the factors weighed in favor of a duty. "The transaction was intended to affect the plaintiffs and it was entirely foreseeable that failing to timely and carefully process the loan modification applications could result in significant harm to the applicants. Plaintiffs allege that the mishandling of their applications 'caus[ed] them to lose title to their home, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages.' " (*Id.* at pp. 948–949.) In considering whether the lender's conduct was blameworthy, the court noted that it was highly relevant that the plaintiffs lacked virtually any bargaining power in the loan modification process. "The borrower's lack of bargaining power coupled with conflicts of interest that exist in the modern loan servicing industry provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification. Moreover, the allegation in the complaint that defendants engaged in 'dual tracking,' which has now been prohibited (see Civ. Code, §§ 2923.6 [lender precluded from recording notice of default or notice of sale while loan modification application is pending], 2924.18 [procedures for mortgage servicer to follow upon borrower's completion of loan modification application]) increases the blame that may properly be

---

[9] These factors are: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of the harm; (3) the degree of certainty that the plaintiff was injured; (4) the connection between the injury and the defendant's conduct; (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (*Biakanja, supra,* 49 Cal.2d at p. 650.)

assigned to the conduct alleged in the complaint." (*Id.* at pp. 949–950.)    The court concluded that the plaintiffs' allegations raised an issue as to whether the lender had breached a duty of care in failing to process the loan modification application in a timely manner, by losing documents and by engaging in dual tracking.  (*Id.* at p. 951.)  The court therefore held that the plaintiffs had set forth a cause of action for negligence in the servicing of their loan and reversed.  (*Id.* at pp. 951–952.)  We believe the reasoning in *Alvarez* is persuasive.

Here, the Nunns have alleged that respondents failed to exercise due care in the review of their loan modification application and engaged in dual tracking by telling them to apply for a loan modification and forgo making their payments, causing them to default on their loan, and using the default to begin foreclosure proceedings.  They also alleged that respondents lost documents, requiring them to resubmit documents over a period of three years to no avail.  These alleged facts are minimally sufficient to support a claim that respondents owed a duty of care.

In their supplemental brief, respondents contend that the *Alvarez* analysis does not apply here because (inter alia) the operative complaint (1) fails to identify any miscalculation or error made by Chase with respect to any particular loan modification application; (2) fails to allege that the Nunns would have qualified for a loan modification but did not receive it; (3) fails to allege they lost title to their home due to any mishandling of the application by Chase; and (4) fails to allege that the Nunns applied for a HAMP loan modification (as opposed to some other kind of loan modification) and that Chase owed the Nunns a duty to exercise reasonable care in processing their application. Respondents also assert the Nunns were legally ineligible for a HAMP modification due to the amount of the outstanding loan and therefore cannot allege that anything Chase did or did not do was the legal cause of their inability to secure a modification.  These points are not relevant to our analysis.  The trial court sustained respondents' demurrer based on its conclusion a lender owes no duty to a residential borrower.  We remand because, pursuant to *Alvarez*, that legal premise is no longer sound.  Whether the negligence claim

17

fails on other grounds and whether the Nunns can proffer amendments to cure any deficiencies are matters to be decided in the trial court.

### H.  *Negligent Infliction of Emotional Distress*

The Nunns alleged that respondents "so negligently and carelessly carried out their statutory duty to offer [the Nunns] a modification" as to cause them to suffer "mental pain and severe distress."  The trial court concluded this was not an actionable claim because respondents did not owe the Nunns any duty of care.  We agree the claim is not actionable, but for a different reason.  As we explain, emotional distress damages cannot be awarded based on a negligence claim resulting only in economic loss.

In *Erlich*, *supra*, 21 Cal.4th 543, the defendant, a contractor, built plaintiffs' home so poorly that it was described by an expert as containing "major and pervasive" defects, including inadequate foundation support, constant leakage throughout the house, disintegrating roof turrets and a deck in danger of " ' "catastrophic collapse." ' " (*Id.* at pp. 548–549.)  The plaintiffs were awarded damages for emotional distress arising out of their fear that the home would collapse around them in an earthquake, and resulting from the shock of learning the extent of the defects, which sent one of the plaintiffs to the hospital. (*Id.* at p. 549.)  Our high court reversed the award on various grounds, among them that emotional distress damages are not recoverable where the harm resulting from the negligence is only economic.  "Even assuming [defendant's] negligence constituted a sufficient independent duty to the [plaintiffs], such a finding would not entitle them to emotional distress damages on these facts.  'The fact that emotional distress damages may be awarded in some circumstances (see Rest.2d Torts, § 905, pp. 456–457) does not mean they are available in every case in which there is an independent cause of action founded upon negligence.' [Citation.]  'No California case has allowed recovery for emotional distress arising solely out of property damage [citation]; moreover, a preexisting contractual relationship, without more, will not support a recovery for mental suffering where the defendant's tortious conduct has resulted only in economic injury to the plaintiff. (*Smith v. Superior Court* (1992) 10 Cal.App.4th 1033, 1040, fn. 1; *Mercado v. Leong* (1996) 43 Cal.App.4th 317, 324 [emotional distress damages are unlikely when

the interests affected are merely economic]; *Camenisch v. Superior Court* (1996) 44 Cal.App.4th 1689, 1691 [emotional distress damages are not recoverable when attorney malpractice leads only to economic loss].)" (*Erlich, supra*, 21 Cal.4th at pp. 554–555.)

The injury to the Nunns for respondents' alleged failure to use due care in processing the loan modification was pecuniary—the anticipated loss of their property. The plaintiffs in *Erlich* had far greater cause for severe anxiety and fear than the Nunns, yet even there, the court refused to expand liability for mental distress where the underlying damages are strictly financial. (*Erlich, supra,* 21 Cal.4th at pp. 554–555.) The general rule is that, "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by [breach of the independent duty]. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests. [Citations.]" (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985.)

### I. *Remaining Causes of Action*

The Nunns contend that the trial court erred in granting summary judgment on their causes of action for promissory estoppel, fraud, negligent misrepresentation, promissory fraud, suppression, and unfair competition because they did not offer any proof of damages. On appeal, they argue that because there is a triable issue of fact on whether they would have qualified for a loan modification, respondents failed to prove that the Nunns did not suffer damages.

The Nunns, however, aside from their theory, offer no authority or citations to the record on the existence of triable issues of fact on the causes of action at issue. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.) The Nunns fail to address the specifics of any of

19

the remaining causes of action.  We therefore treat any issues concerning those claims as waived.

### III.  DISPOSITION

The judgment is reversed as to the causes of action for breach of the implied covenant of good faith and fair dealing and negligence.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  The Nunns shall recover their costs on appeal.

_____

Rivera, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.